IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JEANIE CHONG, | Case No. 3:14-cv-244-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| STL INTERNATIONAL, INC. and COSTCO WHOLESALE CORPORATION, | |
| Defendants. | |

William A. Gaylord and Todd A. Bradley, GAYLORD EYERMAN BRADLEY, P.C., 1400 S.W. Montgomery Street, Portland, OR 97201. Of Attorneys for Plaintiff.

Mark P. Scheer, Dennis G. Woods, and Kelsey A. Terry, SCHEER LAW GROUP LLP, 101 S.W. Main Street, Suite 1600, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff purchased an inversion table manufactured by Defendant STL International, Inc.

("STL") and sold by Defendant Costco Wholesale Corporation ("Costco") (collectively,

"Defendants"). A few months later, Plaintiff was injured when she purportedly fell from the

inversion table while it was fully inverted. Plaintiff alleges strict product liability based on

PAGE 1 –OPINION AND ORDER

defective design. Before the Court is Plaintiff's motion to strike the expert reports of Defendants' expert, Jeffrey Johnson, M.D., and to exclude evidence or testimony of Dr. Johnson's opinions from trial. For the reasons discussed below, Plaintiff's motion to strike the expert report is granted.

## STANDARDS

The United States Court of Appeals for the Ninth Circuit has discussed the standard under which a district court should consider the admissibility of expert testimony. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014). As explained by the Ninth Circuit:

> Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702.
>
> Under *Daubert* [*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)] and its progeny, including *Daubert II* [*Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311 (9th Cir. 1995)], a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).
>
> "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert*, 509 U.S. at 597). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they

are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

The test of reliability is flexible. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc). The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. *Id.; see also Primiano*, 598 F.3d at 564. But these factors are "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted); *see also Barabin*, 740 F.3d at 463. The test "is not the correctness of the expert's conclusions but the soundness of his methodology," and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 564-65. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

*Id.* at 1043-44 (alterations in original).

The district court's role as a gatekeeper of *reliable* expert testimony is to independently ensure that the expert's methods are valid. *Daubert*, 509 U.S. at 590 n. 9. "The trial court's gate-keeping function requires more than simply taking the expert's word for it." Fed. R. Evid. 702, Advisory Comm. Note to 2000 Amendments (citing *Daubert II*, 43 F.3d at 1319). "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive . . . ." *Daubert II*, 43 F.3d at 1315-16. "[T]he expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Id.* at 1316.

Further, the court's "gatekeeping inquiry must be tied to the facts of a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quotation marks omitted). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The court may exclude expert testimony if it determines "that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

"Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (quoting *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997)); *see also Daubert*, 509 U.S. at 590 (noting that the trial judge must insure that the expert's opinion is based upon "more than subjective belief or unsupported speculation. . . . Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known"). An opinion based on unsubstantiated and undocumented information "is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702." *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998). Many "courts have generally held that an expert's opinion 'should be excluded when it is based on assumptions which are speculative and are not supported by the record.'" *Morrison v. Quest Diagnostics, Inc., et al.*, 2016 WL 3457725, at *4 (D. Nev. June 23, 2016) (quoting *Blake v. Bell's Trucking, Inc.*, 168 F. Supp. 2d 529, 532 (D. Md. 2001)) (additionally citing numerous cases rejecting expert testimony based on speculation or assumptions that are inadequately supported in the record); *see also McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (upholding the district court's exclusion of one expert whose testimony was found to be "speculation" that "rests on unsupported assumptions and

ignores distinctions crucial to arriving at a valid conclusion" and the exclusion of another expert whose testimony was found to be "speculation" that had "scant basis in the record").

In further recognition of the flexible nature of the *Daubert* inquiry, the Ninth Circuit has "provided additional guidance" for evaluating the reliability of an expert's opinion. *Lust*, 89 F.3d at 597. "[O]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying." *Daubert II*, 43 F.3d at 1317; *see also Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003). Where "an expert did not conduct his or her own research, independent of the litigation, on the subject of the testimony, the district court must determine whether there exists any 'objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002) (quoting *Daubert II*, 43 F.3d at 1317-18). The Ninth Circuit explained how such objective, verifiable evidence may be shown:

> Experts may demonstrate the scientific validity of a theory or technique by showing that "the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." [*Daubert II*, 43 F.3d] at 1318. Alternatively, testifying experts may also show the validity of their theory by explaining "precisely how [the experts] went about reaching their conclusions and point[ing] to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319.

*Id.* at 605-06 (first alteration added, remaining alterations in original); *see also Clausen*, 339 F.3d at 1056.

Where expert medical testimony is at issue, it may or may not be scientific evidence like the evidence at issue in *Daubert*. *Primiano*, 598 F.3d at 565. As the Ninth Circuit explained:

> [M]edicine is not a science but a learned profession, deeply rooted in a number of sciences and charged with the obligation to apply them for man's benefit. Evidence-based medicine is the conscientious, explicit and judicious use of current best evidence in making decisions about the care of individual patients. Despite the importance of evidence-based medicine, much of medical decision-making relies on judgment—a process that is difficult to quantify or even to assess qualitatively. Especially when a relevant experience base is unavailable, physicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties to mak[e] a sound judgment.
>
> When considering the applicability of *Daubert* criteria to the particular case before the court, the inquiry must be flexible. Peer reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be in the literature. Lack of certainty is not, for a qualified expert, the same thing as guesswork.
>
> * * *
>
> We have some guidance in the cases for applying *Daubert* to physicians' testimony. A trial court should admit medical expert testimony if physicians would accept it as useful and reliable, but it need not be conclusive because medical knowledge is often uncertain. The human body is complex, etiology is often uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof. Where the foundation is sufficient, the litigant is entitled to have the jury decide upon [the expert's] credibility, rather than the judge.

*Id.* at 565-66 (quotation marks and footnote citations omitted) (alterations in original).

"It is the proponent of the expert who has the burden of proving admissibility." *Lust*, 89 F.3d at 598. Admissibility of the expert's proposed testimony must be established by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n. 10 (*citing Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)). The party presenting the expert must demonstrate that the

expert's findings are based on sound principles and that they are capable of independent validation. *Daubert II,* 43 F.3d at 1316.

## BACKGROUND

Plaintiff asserts that on March 10, 2012, she used her STL InvertAlign 5 Inversion Table ("InvertAlign") the same way she had been using it for six months. She used it once in the morning, without incident. She used it a second time in the evening. She testified that she was wearing lace up tennis shoes, stepped on the machine, pulled the handle of the ankle locking mechanism as close as possible to her ankles, and then moved the handle away from her body until she heard the locking mechanism click into place. She fully inverted, counted to 60, and then began counting again and reached approximately the number five before blacking out and regaining consciousness on the ground, unable to move her legs. She testified that she slipped out of her shoes, although she does not recall whether her shoes fell to the ground or were still in the ankle locking system after she fell. Her significant other, Mr. Yong Seon Kim, who lives with her and purchased the InvertAlign with her, testified that the InvertAlign's ankle lock system was still in the locked position after Plaintiff fell.

Reports from the first responders on the scene note that Plaintiff was supine under the InvertAlign "with her foot propped up on a cross bar." She was unable to move her foot herself, so the paramedics lowered her foot to the floor. She was unable to move her lower extremities. She is now a permanent paraplegic.

## DISCUSSION

### A. Qualifications of Dr. Johnson

Plaintiff does not challenge the qualifications of Dr. Johnson. His knowledge and experience, however, is relevant to the Court's analysis regarding the foundation of his opinions. Accordingly, the Court briefly summarizes Dr. Johnson's qualifications.

PAGE 7 –OPINION AND ORDER

Dr. Johnson is a neurosurgeon practicing in Portland, Oregon. Dr. Johnson has nearly 26 years of experience in surgery and neurosurgery. He graduated from the College of Physicians and Surgeons at Columbia University in 1990, interned for one year in general surgery at Columbia Presbyterian Medical Center, was a clinical fellow for one year in surgical neurology at the National Institutes of Health, performed his residency in neurosurgery at Columbia Presbyterian Medical Center, and continued in private practice in neurosurgery. He is Board-certified in neurosurgery and is a fellow in the American College of Surgeons. Dr. Johnson has experience treating patients with Ossification of the Posterior Longitudinal Ligament ("OPLL"), which is which is a chronic degenerative condition, most often seen in the cervical spine. He has co-authored nine published articles in his field. He has previously testified as an expert on behalf of both plaintiffs and defendants.

**B. Opinions of Dr. Johnson**

Dr. Johnson reviewed the Complaint in this action, Plaintiff's medical records from her treatment at Oregon Health and Sciences University following the incident in March 2012, Plaintiff's earlier medical records from her primary care physician, reports from Plaintiff's imaging, medical literature regarding OPLL, and "information pertaining to the InvertAlign." Dr. Johnson did not meet, examine, or interview Plaintiff. Dr. Johnson issued an opinion letter dated July 20, 2015 ("Johnson Report"). ECF 66-1. In this letter, Dr. Johnson rendered several opinions challenged by Plaintiffs.

The Johnson Report begins with an explanation of OPLL, a condition characterized by thickening and calcification of the posterior longitudinal ligament, which runs the length of the spinal column along the back of the spinal column. The anterior longitudinal ligament runs along the front of the spinal column. Behind the posterior longitudinal ligament is the spinal canal, which holds the spinal cord. Also within the spinal canal are "laminae," which are the bones at

PAGE 8 –OPINION AND ORDER

the back of the spinal canal that form the roof of the spinal canal, and "ligamentum flavum," which is elastic tissue that runs between the laminae.

The ligament thickening caused by OPLL narrows the spinal canal and can compress the spinal cord. OPLL can be diagnosed based on varying symptoms, including neck pain, headaches, radiculopathy (nerve compression, with symptoms including pain, numbness, tingling, or weakness in the neck, shoulder, arm, or hand), and myelopathy (spinal cord compression, with symptoms including weakness, clumsiness, numbness, tingling in the arms or legs, or problems with bowel or bladder function). OPLL can also be present in people who have no symptoms and can be discovered when imaging is done for an unrelated reason. It can also be seen in patients who have sudden or acute symptoms, despite no discernible injury or event.

In his report, Dr. Johnson states that a person who falls a short distance onto his or her head would most likely have no injury to the head, neck, or spine but would have only minor bruising or contusion at the point of impact, aches and pains, neck stiffness and soreness, or other temporary symptoms. Dr. Johnson notes, however, that it is possible to suffer a serious injury, such as a concussion or brain contusion, or a neck fracture or dislocation, from such a fall.

Dr. Johnson opines that Plaintiff did not suffer injuries that support a finding that a "major impact" occurred. Dr. Johnson notes that the paramedics and doctors in the emergency department did not describe bruising or contusions to Plaintiff's face or scalp, there is apparently no evidence that Plaintiff suffered a concussion, there was no fracture or dislocation of Plaintiff's cervical spine, and that Plaintiff's surgeons did not perform a fusion or stabilization of her cervical spine. Dr. Johnson adds that persons who suffer catastrophic injuries to the spinal cord typically exhibit obvious damage to the structure of the spine, but Plaintiff did not. Dr. Johnson

emphasizes that Plaintiff's surgery was a "laminectomy," which removed some of the bone and ligamentum flavum along the back of her spine in order to decompress the spinal cord. Dr. Johnson notes that the only evidence of injury to Plaintiff's spine and head was a bruise or contusion of her spinal cord, but that there is no evidence of acute injury to Plaintiff's spine.

Dr. Johnson reviewed the findings from Plaintiff's surgery that Plaintiff had calcification and thickening of the ligamentum flavum to such an extent that the surgeon had difficulty removing it performing the laminectomy. Dr. Johnson notes that this likely further narrowed Plaintiff's spinal canal. Dr. Johnson also notes that this condition is often present in patients with OPLL and concludes that it probably represents a more general disturbance of the structure of Plaintiff's spine than just thickening of the posterior longitudinal ligament.

Dr. Johnson opines that the critical factor in Plaintiff's outcome was the presence of OPLL and that in the absence of OPLL, "it is certain that the result of the fall would have been either a trivial injury or no injury at all." ECF 66-1 at 3. The measurement of Plaintiff's cervical spine after the fall was only 2 millimeters in diameter, whereas the typical diameter is 10-12 millimeters, demonstrating "extreme" narrowing of Plaintiff's spinal canal. Dr. Johnson notes that he has never seen such pronounced narrowing of the canal. He points out that Plaintiff not only had OPLL thickening her ligament along the cervical spine, but that she also had thickening of the ligamentum flavum at the back of her spine and that Plaintiff's spinal cord injury occurred exactly at the point where her cervical spine was threatened from both the back and front. Because Plaintiff's narrow canal was not a result of her fall and was "the state of [Plaintiff's] anatomy long before the events of that day," Dr. Johnson concludes that Plaintiff's narrow canal was the "factor that produced a permanent injury to [Plaintiff's] spinal cord from what would have otherwise been a trivial event." ECF 66-1 at 3.

Dr. Johnson notes that Plaintiff's OPLL was not known before her surgery and that there were only "minor clues" in her medical record—references to neck and shoulder pain or stiffness in 2006 and 2007 and a recommendation at one point for neck exercises. Dr. Johnson clarifies, however, that at no point were neck complaints a primary reason for Plaintiff to visit a medical provider and that Plaintiff "had only minor and nonspecific symptoms." *Id.*

Dr. Johnson opines that "[i]t is not unusual for OPLL to remain undetected until it presents catastrophically after a minor injury." *Id.* at 3. Dr. Johnson cites to an article reviewing studies involving 453 patients who presented with spinal cord injury with OPLL that noted that the "majority" of those patients were not aware of their OPLL. *Id.*

In his report, Dr. Johnson concludes:

> The injury that Ms. Chong suffered represents a tragic coincidence. She had an unrecognized condition of her cervical spine, the clues to which were so subtle as to be undetectable except in hindsight. She had minor, nonspecific symptoms that are extremely prevalent. The vast majority of people who have these symptoms do not have OPLL. . . . When OPLL is found, it is frequently treated without surgery. Had [Plaintiff] undergone an MRI prior to the injury the OPLL would have been found. However, in the absence of a history of symptoms or physical findings, it is not clear that surgery would have been recommended.

> When [Plaintiff] fell, much like the patients in the studies referenced above, the otherwise minor trauma to her neck in the setting of a critically narrowed spinal canal produced an injury to her spinal cord that lead to all of the other consequences, including her hospitalization, surgery, neurological deficits, and her disability. The fall produced no other injuries except that to her spinal cord. This association between OPLL and paralysis with minor trauma is also frequently encountered. In the large review article the authors note that "Most of cervical SCI (spinal cord injuries) associated with OPLL were incomplete, without bone injury, and caused predominantly by **low-energy trauma**." (emphasis added) (Chikuda).

> References to minor injuries producing devastating neurological outcomes appear throughout the literature (Yoo, Katoh). "Patients

with ossification of the posterior longitudinal ligament (OPLL) sometimes present with acute spinal cord injury caused by only minor trauma." (Koyanagi). If [Plaintiff] had not fallen as it is alleged from the InvertAlign on 3/10/2012 it is entirely possible that Ms. Chong would have suffered the same outcome from another minor head or neck injury. Events such as minor automobile accidents, ground-level slip and falls, or minor head trauma like striking the head on a drawer could also have lead to her injury. Reports exist in the literature of patients with OPLL suffering from paralysis after neck massage (Cheong) or falling and landing on one's backside (Chikuda).

It would be expected that Ms. Chong's OPLL would have continued to progress silently. The risk of sudden neurological symptoms would also increase with time. Given her relatively young age, it is reasonable to assume that the likelihood of minor trauma happening at some point was high. If she had not, as it is alleged, fallen from the InvertAlign there was a very high likelihood that this neurological outcome would have nonetheless occurred. I would not have been surprised if she had developed severe neurological deficits or paraplegia within a few years.

The description of the incident by Ms. Chong also raises questions as to whether there was any trauma to the neck at all. There is also an indication that she may have had a "funny feeling" while inverted on the device prior to allegedly falling. It is possible that she was already exhibiting evidence of spinal cord compression at that point. With the precarious status of her cervical spinal canal it seems possible that even the process of getting into the InvertAlign, flexing or extending the neck, or transitioning to an inverted position may have been the trigger for her spinal cord injury.

It is my opinion that the injuries suffered by Ms. Chong were due to the presence of her previously undiagnosed OPLL and that if a fall occurred it was incidental to the outcome.

ECF 66-1 at 3-4.

On September 28, 2015, Dr. Johnson issued a supplemental opinion letter ("Johnson Supplemental Report"). Before issuing this letter, Dr. Johnson reviewed the report of Dr. Jennifer Lawlor and the transcript of Dr. Andrew Nemecek's deposition. Dr. Lawlor cared for Plaintiff during her recovery. Dr. Johnson emphasizes that Dr. Lawlor indicates that "there

was no evidence of cervical spine fracture on diagnostic imaging."[1] Dr. Johnson notes that this finding is "highly significant" because in a typical traumatic neck injury from a fall or other accident one "would expect to see a fracture or dislocation in a patient presenting with acute spinal cord injury."[2]

Dr. Johnson also notes that Dr. Nemecek, who performed Plaintiff's surgery, testified that there were no skeletal injuries to Plaintiff's spine and that her OPLL was very severe, with compression on both sides of her spinal cord. Dr. Nemecek further testified that he had never seen a case as bad as Plaintiff's, with compression on both sides. Dr. Johnson reiterates that the factor that produced Plaintiff's catastrophic injury was the severe narrowing of her spinal canal caused by her OPLL. Dr. Johnson again concludes that "[i]f this preexisting and unknown condition had not also been present, Ms. Chong would not have suffered [her] neurological injuries" and that "[t]he OPLL is the critical factor—not the minor trauma." *Id.* at 2, 3.

New in the Johnson Supplemental Report is the statement that in addition to severe injury in patients with OPLL from minor trauma, there are patients who experience neurological worsening without any trauma. Dr. Johnson does not cite to any authority supporting this statement. Specifically, Dr. Johnson states:

> Examples of patients developing severe and permanent neurological injury with OPLL from low-energy, seemingly minor trauma may be found throughout the medical literature. I provided several references in my initial report. There are also examples of patients who experience sudden neurological worsening without any trauma. Since Ms. Chong testified to feeling the possible onset of symptoms while using the device prior to finding herself on the floor, it is possible that the paralysis developed before she slipped from the InvertAlign.

---

[1] ECF 66-2 at 1.

[2] *Id.*

*Id.* at 2. In reaching this conclusion, Dr. Johnson notes that Plaintiff testified to "feeling numbness and tingling in her body while she was using the InvertAlign device." *Id.* at 3.

## C. Plaintiff's Challenges to Dr. Johnson's Opinions

Plaintiff argues that Dr. Johnson's opinions: (1) are not relevant or helpful to a jury; (2) are not based on any reliable foundation and are speculative; and (3) are an appeal for jury nullification. Plaintiff also argues that the probative value of Dr. Johnson's opinions is substantially outweighed by other factors and thus his opinions should be excluded under Federal Rule of Evidence 403. Because the Court finds that Dr. Johnson's opinions must be excluded as irrelevant, not helpful to the jury, speculative, and unreliable, the Court does not reach Plaintiff's arguments regarding jury nullification and undue prejudice.

### 1. Relevance

Plaintiff argues that Dr. Johnson's opinions are not relevant or helpful to a jury because Dr. Johnson merely opines that without Plaintiff's OPLL her injuries would have been "trivial," and that because of her OPLL it is possible that she would have had a catastrophic injury later due to some other "minor" head or neck injury.[3] This, argues Plaintiff, is contrary to the well-settled "eggshell plaintiff" doctrine, in which a defendant takes the plaintiff as he finds her. *See Restatement (Third) of Torts: Phys. & Emot. Harm* § 31 (2010) ("When an actor's tortious conduct causes harm to a person that, because of a preexisting physical or mental condition or other characteristics of the person, is of a greater magnitude or different type than might reasonably be expected, the actor is nevertheless subject to liability for all such harm to the person."); *see also Pierce v. S. Pac. Transp. Co.*, 823 F.2d 1366, 1372 n.2 (9th Cir. 1987) ("The eggshell plaintiff rule simply means that a tortfeasor takes his victim as he finds him. Clearly the

---

[3] ECF 66-1 at 3, 4.

eggshell plaintiff rule applies in cases in which the cause and effect of an injury are physical.");

*Gresham v. Petro Stopping Ctrs., LP*, 2011 WL 1748569, at *4 (D. Nev. Apr. 25, 2011) (noting

that the eggshell plaintiff "rule subjects a negligent actor to liability for the full extent of a

plaintiff's damages, no matter how fragile a plaintiff is, so long as the defendant was in fact

negligent and some amount of harm was foreseeable" and reciting the illustration from the

*Restatement (Second) of Torts* § 461 (1965),[4] that where a slight kick to a person's shin causes

serious harm because of a latent infection, the kicker is subject to liability for the full extent of

the injuries).

 Defendants respond that Plaintiff skips the causation aspect of Dr. Johnson's opinions

and focuses instead on damages. This argument by Defendants relates only to Dr. Johnson's

opinion that Plaintiff may have become paralyzed before she fell. The Court agrees that this

testimony may be relevant, but excludes this testimony as unreliable, as discussed below in

Subsection C.2. The remainder of Dr. Johnson's opinions are that Plaintiff did not suffer a major

trauma to her spine, would have suffered only minor injuries were it not for OPLL, and because

of Plaintiff's OPLL she possibly would have suffered a catastrophic injury in the future from

some other minor head or neck injury. Dr. Johnson explains the condition of OPLL and explains

why it was Plaintiff's OPLL that turned what would otherwise have been a minor trauma into a

tragic event. All of this information, however, is neither relevant nor helpful to a jury because

Defendants must take Plaintiff as she was, even if she was significantly more susceptible to

greater injury than a "normal" person. *Cf. Fuller v. Merten*, 173 Or. App. 592, 597 (2001)

---

 [4] This section, entitled "Harm Increased in Extent by Other's Unforeseeable Physical
Condition," states: "The negligent actor is subject to liability for harm to another although a
physical condition of the other which is neither known nor should be known to the actor makes
the injury greater than that which the actor as a reasonable man should have foreseen as a
probable result of his conduct." *Restatement (Second) of Torts* § 461 (1965).

("From the evidence before the jury, it could have determined that (1) plaintiff's neck was fractured in the collision, but (2) plaintiff 'had a bodily condition that predisposed her to be more subject to injury than a person in normal health.' UCJI 70.08. Given that evidence, there was, at least, the very real potential that, notwithstanding causation-in-fact, the jury would fail to award plaintiff damages for the neck fracture because of her peculiar susceptibility to injury. That is, there was the potential that jurors might decide that, because the same impact would not have fractured the neck of a 'normal' person, plaintiff should not recover damages for that injury. That is precisely the circumstance that UCJI 70.08 is designed to address and remedy.").[5]

Dr. Johnson's opinion that without Plaintiff's previously unknown OPLL, she would only have suffered, at most, a minor injury is legally irrelevant because Defendants may not escape liability or seek reduced damages by arguing that Plaintiff would not have suffered catastrophic injuries but for her unknown, preexisting OPLL or that because of her condition she possibly would have become paralyzed anyway. *Id.* (noting that the jury "cannot engage in such 'it would not have happened to a normal person' or 'her neck was going to break anyway' *denial* or discounting of damages" (emphasis added)); *see also Gresham*, 2011 WL 1748569, at *4 ("In this case, Plaintiff anticipates that Dr. Huene will testify that Plaintiff's femur broke upon her fall because of osteoporosis of her left femur and osteoarthritis in her left knee. But under the *Restatement*, so long as Defendants were negligent and some injury was foreseeable, they are liable for the entire extent of Plaintiff's injuries even if the extent of those injuries was not

---

[5] Oregon's Uniform Civil Jury Instruction ("UCJI") 70.08 has subsequently been renumbered to UCJI 70.06 and states: "If you find that the [plaintiff/defendant] had a bodily condition that predisposed [him/her] to be more subject to injury than a person in normal health, nevertheless the [plaintiff/defendant] would be liable for any and all injuries and damage that may have been suffered by the [plaintiff/defendant] as the result of the negligence of the [plaintiff/defendant], even though those injuries, due to the prior condition, may have been greater than those that would have been suffered by another person under the same circumstances."

foreseeable. The Court will exclude the testimony as to the extent of Plaintiff's injury, but not as to causation of the fall. Evidence that a preexisting condition caused the fall will not be excluded."). Accordingly, Dr. Johnson's opinions that Plaintiff suffered only a minor trauma, would not have suffered significant injury were it not for her OPLL, and possibly would have become paralyzed at some point in the future are stricken and disallowed.

### 2. Reliability

Plaintiff argues that Dr. Johnson's opinions that Plaintiff possibly may have later become paralyzed from some other minor head or neck injury and that Plaintiff became paralyzed before she fell should be excluded as unreliable and speculative. The Court agrees.

The Johnson Report concludes that if Plaintiff had not been injured using her InvertAlign, it is possible that Plaintiff eventually would have become paralyzed anyway due to some other minor head or neck injury. The Court already has found this testimony to be unhelpful to the jury based on the "eggshell" plaintiff rule and excludable on that basis. The Court also finds it to be unreasonably speculative.

During his deposition, Dr. Johnson testified that the percentage likelihood that Plaintiff would have suffered a trauma to her spinal cord that resulted in paralysis was "non-zero," but he could not provide a more precise percentage, and he could not offer a scientific basis for this conclusion because it "is all speculation" and in dealing with human beings "these things are unknowable."[6] Although it may be that Plaintiff eventually might have suffered from some other injury that might have caused paralysis, it is also possible that she might have begun exhibiting symptoms from her OPLL, underwent diagnostic imaging, and had corrective surgery before

---

[6] ECF 66-3 at 27 (Dr. Johnson's deposition transcript at 102:7-25).

PAGE 17 –OPINION AND ORDER

some other injury caused paralysis.[7] It is not possible to know with any degree of confidence or medical probability what would have happened were it not for Plaintiff's experience on the InvertAlign on March 10, 2012.[8] Accordingly, Dr. Johnson's opinion that it was "possible" that Plaintiff might have become paralyzed at some point in the future is speculative and insufficiently reliable, and thus inadmissible.

Similarly, the Court finds that Dr. Johnson's broad statements in his reports that Plaintiff *may* have become paralyzed *before* falling from her InvertAlign is speculative and unreliable. In considering this opinion by Dr. Johnson, the Court notes that it was developed "expressly for the purposes of testifying." *Daubert II*, 43 F.3d at 1317. Although Dr. Johnson has treated patients with OPLL, he has not identified any study or article he was involved in discussing spontaneous paralyzation caused by OPLL. Thus, the Court looks for "any objective, verifiable evidence that the testimony is based on scientifically valid principles," such as "a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal . . . ." *Domingo*, 289 F.3d at 605-06 (quotation marks omitted). The Court does not find any such objective, verifiable evidence.

In his reports, Dr. Johnson discusses medical literature showing that patients with OPLL can have devastating neurological outcomes from only *minor* trauma.[9] Dr. Johnson, however,

---

[7] *See, e.g.*, ECF 66-3 at 26 (Dr. Johnson's deposition transcript at 97:6-20) (noting that surgery would have reduced the risk of Plaintiff having a catastrophic injury).

[8] Although Defendants dispute that Plaintiff fell due to a defective design on the InvertAlign, they do not dispute that she was on the InvertAlign immediately before becoming paralyzed. For example, they do not contend that she fell elsewhere, became paralyzed, and was moved and positioned onto the InvertAlign.

[9] ECF 66-1 at 3-4; 66-2 at 2.

PAGE 18 – OPINION AND ORDER

does not discuss in his reports any article, study, or personal patient experience involving paralysis or devastating neurological outcomes from *no* trauma.

Defendants argue that one article cited by Dr. Johnson supports Dr. Johnson's conclusion. The relevant section of this article states:

> Spontaneous neurological deterioration was also found in patients who had not suffered any kind of trauma, although such an occurrence was rare. Among those without trauma, 16 patients whose [residual AP diameter] was less than 10mm and who had been treated conservatively, five showed spontaneous neurological deterioration mainly due to progression of OPLL itself, whereas only two out of 34 patients whose [residual AP diameter] was 10mm or more, had neurological deterioration.

S. Katoh, *et al.*, "Influence of Minor Trauma to the Neck on the Neurological Outcome in Patients with Ossification of the Posterior Longitudinal Ligament (OPLL) of the Cervical Spine," 33 PARAPLEGIA, at 330-333 (June 1995). This excerpt supports the fact that even without trauma, some patients with OPLL who were conservatively treated suffered neurological deterioration without associated trauma, mainly due to the "progression" of OPLL. It does not, however, support a conclusion that a patient can become spontaneously paralyzed without ever having had any symptom of OPLL and without having suffered any trauma.

During his deposition, Dr. Johnson testified that he had patients who became spontaneously paralyzed without any trauma, but upon further questioning clarified that they had worsening symptoms over a period of days to weeks and that they usually identified some incident, such as a fall, that triggered their period of decline.[10] Dr. Johnson offered no example from his experience treating OPLL of a patient who instantaneously became paralyzed from OPLL without having shown any previous symptoms and without suffering any trauma.

---

[10] ECF 66-3 at 33 (Dr. Johnson's deposition transcript at 126:10-128:2).

PAGE 19 –OPINION AND ORDER

Defendants argue that Dr. Johnson's opinion demonstrates how little evidence of trauma there was from Plaintiff's alleged fall, which Defendants further argue supports Dr. Johnson's finding that a fall may not have caused Plaintiff's injury. These findings by Dr. Johnson, however, are made in support of his opinion that Plaintiff suffered minor, as opposed to major, trauma from her fall and that Plaintiff's catastrophic injury was therefore a result of her OPLL and not a traumatic injury from a fall. These opinions relate to the "eggshell" aspect of Plaintiff—that she had an unknown, preexisting condition that resulted in catastrophic injuries from what in Dr. Johnson's opinion otherwise would have caused only trivial injuries.

Further, although Dr. Johnson states that he read the deposition transcript of Dr. Nemecek, Plaintiff's surgeon, before issuing the Johnson Supplemental Report, Dr. Johnson does not address in his Supplemental Report Dr. Nemecek's testimony that Plaintiff did have evidence of a serious injury to her spinal cord. Dr. Nemecek testified that Plaintiff's spinal cord was inflamed, red, and swollen, all indicating "a very injured spinal cord"; that what Dr. Nemecek saw in surgery was a "spinal cord that looked horribly injured"; and that Plaintiff's MRI showed that her "spinal cord was extremely swollen" and that the swelling was "very acute . . . very new" and not "chronic swelling."[11] Dr. Nemecek disputed that Plaintiff's spinal cord injury on her MRI was from her chronic OPLL, noting that when the spinal cord is compressed chronically for long periods of time, the "opposite" of extreme swelling occurs and the spinal cord shrinks.[12] The Johnson Supplemental Report quotes from other portions of Dr. Nemecek's testimony, but does not address the portions discussing Plaintiff's spinal cord injury. During his deposition, Dr. Johnson testified that he "would not disagree" with these

---

[11] *See* ECF 66-5 at 3, 4 (Dr. Nemecek's deposition transcript at 14:16-15:12, 15:19-16:3, 22:2-13).

[12] *Id.* at 4 (Dr. Nemecek's deposition transcript at 22:7-11).

observations of Dr. Nemecek made at the time of surgery.[13] Dr. Johnson also testified during his deposition that Plaintiff's MRI imaging indicated an acute trauma.[14] Yet the Johnson Supplemental Report does not provide any basis for how Dr. Johnson reaches the conclusion that Plaintiff did not suffer *any* trauma to her spinal cord and may have become paralyzed before falling, despite this testimony by Dr. Nemecek and Plaintiff's MRI imaging showing acute trauma.

Defendants generally argue that Dr. Johnson's knowledge and experience as a neurosurgeon renders his opinions reliable. An expert opinion is reliable, however, only "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Pomona*, 750 F.3d at 1044 (citing *Primiano*, 598 F.3d at 565) (quotation marks omitted). "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

During his deposition, Dr. Johnson testified that it was "possible" that something went wrong with Plaintiff's spinal cord before her fall, although he would not say it was "probable."[15] When asked if he held this opinion to a reasonable medical probability, he responded "I don't know."[16] Dr. Johnson's equivocal testimony that he did not know if Plaintiff became paralyzed before falling and that it was only "possible" and not "probable" is in notable contrast to his testimony that without Plaintiff's OPLL she would have suffered only minor injury from her fall.

---

[13] ECF 66-3 at 24 (Dr. Johnson's deposition transcript at 91:16-92:2).

[14] *Id.* at 21 (Dr. Johnson's deposition transcript at 77:19-78:3).

[15] *See id.* at 18-19 (Dr. Johnson's deposition transcript at 65:19-69:4).

[16] *Id.* at 24 (Dr. Johnson's deposition transcript at 91:8-91:12).

When asked if he held that opinion to reasonable medical probability, Dr. Johnson responded "yes."[17]

Dr. Johnson further testified that his only piece of evidence that something neurological was happening to Plaintiff before the fall was the third-party testimony that Plaintiff stated that she was feeling numbness and tingling in her legs before falling.[18] Plaintiff disputes this fact, noting that Plaintiff has denied making any such statement and that no witness stated that Plaintiff suffered from "numbness and tingling," but merely that Plaintiff had a "funny feeling."[19]

Assuming that Plaintiff did state that she had a "funny feeling," Dr. Johnson provides no examples, however, of persons with OPLL becoming spontaneously paralyzed after a "funny feeling," or even feeling numbness and tingling, or any reasoned methodology or scientific basis from which he concluded that Plaintiff could have become spontaneously paralyzed from her OPLL. Dr. Johnson instead testified that even absent Plaintiff's purported numbness and tingling it was "possible" something went wrong before her fall because "[w]e don't know. . . . we don't have a video. We don't have a witness. So as I say it is possible."[20]

Dr. Johnson's opinion that it is "possible" Plaintiff could have become paralyzed and then fell from her InvertAlign does not rest on sufficient facts or data, is unreasonably speculative, and is not helpful to a jury, at least without more. *See Guidroz-Brault v. Missouri*

---

[17] *See id.* at 19 (Dr. Johnson's deposition transcript at 71:3-13).

[18] *Id.* at 18 (Dr. Johnson's deposition transcript at 65:19-68:6).

[19] The Court notes that in her deposition Plaintiff denied having any such feeling before she fell and that the specific evidence reviewed by Dr. Johnson was a third party testifying that shortly after her fall Plaintiff said she had a "funny feeling" before falling.

[20] ECF 66-3 at 18 (Dr. Johnson's deposition transcript at 68:10-14).

*Pac. R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2001) (affirming the exclusion of expert testimony where the testimony did "was not sufficiently founded on facts"); *Chilcote v. Fireman's Fund Ins. Co.*, 2007 WL 7724579, at *3 (D. Mont. Nov. 30, 2007) (excluding the defendant's medical expert and noting that "a medical opinion expressed in terms of 'doubt' invites speculation that would not assist the trier of fact and is not otherwise sufficiently certain to meet Rule 702's standards for admissibility"). The only relevant facts or data relied on by Dr. Johnson is that Plaintiff had an extreme case of OPLL and purportedly had a "funny feeling" and from that he concluded that it was possible, although not probable, that Plaintiff became spontaneously paralyzed, but with the caveat that Dr. Johnson really cannot know. This is insufficient. Although medical opinions need not be "conclusive," they must still have a sufficient foundation.[21]

*Primiano*, 598 F.3d at 566.

The cases relied on by Defendants in encouraging the Court to exercise its discretion to admit Dr. Johnson's speculative opinion that it is "possible" that Plaintiff became paralyzed before she fell from her InvertAlign are either distinguishable or inapposite. First, Defendants cite *Johns v. Bayer Corp.*, 2013 WL 1498965, at *10 (S.D. Cal. Apr. 10, 2013). Defendants quote from a portion of an expert's opinion noting that a certain supplement "potentially may" be

---

[21] Even if Dr. Johnson could cite to medical articles or studies showing that persons with OPLL can become paralyzed without any previous symptoms or triggering trauma (minor or otherwise), his opinion still may not be relevant or helpful to a jury in this case. Without evidence that a paralyzed person could fall out of the InvertAlign, a hypothetical ability to become paralyzed from being inverted may not be an appropriate "fit" to the facts of the case. *Daubert*, 509 U.S. at 591) (noting that the expert opinion must "fit" the facts of the case and serve a "helpful" purpose to the jury). Defendants have not offered any such evidence or argument and, to the contrary, argued in their supplemental brief that Plaintiff's left leg came out of her InvertAlign and then Plaintiff "struggled to get out of the machine." ECF 75 at 11. "Struggling" to get out is inconsistent with becoming paralyzed and then falling out of the machine while immobile. Regardless, what is before the Court is Dr. Johnson's opinion that it is possible that Plaintiff became paralyzed from being inverted without having any previous symptoms from her OPLL and without first suffering any trauma. That opinion is not sufficiently reliable or helpful to a jury.

toxic if consumed in large amounts and then quote a later conclusion by the court that although

the challenging party may disagree with the ultimate conclusions of the expert, such disputes are

better attacked through rigorous cross-examination. Defendants argue that the court in *Johns*

admitted the expert testimony despite the opinion being couched as a "possibility." The expert

testimony, however, was not challenged as being unreasonably speculative. To the contrary, the

challenge that the court rejected as better left for cross examination was that the expert himself

required a too-demanding burden of proof. The entirety of the court's analysis on this point was:

> Bayer's remaining two objections are also easily dispatched. First,
> Bayer contends Dr. Milman's testimony is unreliable because he
> demands application of a "definitive proof" standard that has no
> basis in the scientific community. However, contrary to Bayer's
> contentions, Dr. Milman's report does not assert that definitive
> proof from a well-controlled randomized clinical trial ("RCT") is
> required in this case, but does, as does Dr. Blumberg (Bayer's
> science expert), recognize the importance of RCTs in the area of
> nutritional science. Thus, although Bayer may disagree with
> Dr. Milman's ultimate conclusions, these findings are properly
> attacked through rigorous crossexamination and the presentation of
> contrary evidence, not exclusion. See *Primiano*, 598 F.3d at 564.

*Id.* Accordingly, this case does not support admission of Dr. Johnson's opinion.

Defendants next rely on *Huff v. Wal-Mart Stores, Inc.*, 1999 WL 1206845, at *2 (9th Cir.

Dec. 15, 1999). In *Huff*, the Ninth Circuit affirmed the district court's admission of the testimony

of the plaintiff's treating physician, who treated the plaintiff both before and after the fall that

allegedly caused her pain. The Ninth Circuit upheld the district court's evidentiary ruling

because the doctor had "clearly delimited his testimony" and "candidly" testified "that after

extensive differential diagnosis he could not point to an objective medical basis for the plaintiff's

pain." *Id.* The Ninth Circuit noted that the fact that imaging and other tests "failed to reveal any

precise physiological cause of Huff's leg complaints does not reduce [the doctor's] conclusions

based on that evidence to non-scientific 'speculation.'" *Id.* Affirming the district court's exercise

of discretion to admit testimony from a treating physician who testified regarding a patient who did not have pain, had a fall, and then had pain but without any objective medical basis for that pain does not support admitting Dr. Johnson's testimony that it is possible Plaintiff became spontaneously paralyzed.

The next case cited by Defendants is *Salazar v. A&J Const. of Mont., Inc.*, 2012 WL 4092421, at *8-9 (D. Mont. Sept. 17, 2012). In *Salazar*, the defendant challenged the testimony by one of the plaintiff's experts that the defendant characterized as opining that future medical treatment "possibly" would be needed. *Id.* at *8. The court found, however, that the defendant had mischaracterized the relevant testimony, which the court found was testified to on a "more probable-than-not or similar basis" and thus was admissible. *Id.* at *9. This case is inapposite, as Dr. Johnson did not opine that it was more probable than not that Plaintiff became paralyzed before she fell.

The final case relied on by Defendants is *Sullivan v. U.S. Dep't of Navy*, 365 F.3d 827 (9th Cir. 2004). In that case, the Ninth Circuit found the district court had abused its discretion in excluding the testimony of a medical expert who opined that "an abnormally long back operation substantially increased the risk of complications including wound infection and skin necrosis . . . ." *Id.* at 833-34. The Ninth Circuit held that the testimony was reliable because it was supported by four textbooks to which the expert referred. This case does not support a finding that Dr. Johnson's testimony is reliable, because Dr. Johnson did not refer to articles, textbooks, or any other objective findings that a person can become instantaneously paralyzed from OPLL without suffering any symptoms or without first experiencing any trauma.

Dr. Johnson provides no reliable basis from his experience as a neurosurgeon nor any studies or articles in the relevant medical literature supporting a finding that Plaintiff became

instantly paralyzed merely from being inverted and then fell out of her InvertAlign, already

paralyzed. Although the Court will not act as a factfinder or weigh the impeachability of an

expert's conclusions, *Pomona*, 750 F.3d at 1044, the Court must exclude evidence that is not

based on sufficient facts or data, is not helpful to a jury, or is unreasonably speculative. Fed. R.

Evid. 702. Accordingly, the Court excludes Dr. Johnson's opinion that it is possible that Plaintiff

became paralyzed before she fell from her InvertAlign.

**CONCLUSION**

Plaintiff's Motion to Strike the expert reports of Dr. Jeffrey Johnson (ECF 65) is

GRANTED. The Johnson Report and Johnson Supplemental Report are stricken and excluded

from use at trial. Further, neither Dr. Johnson nor any other witness may testify regarding the

opinions expressed in Dr. Johnson's reports at trial.

**IT IS SO ORDERED.**

DATED this 10th day of August, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge